IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| PHYLLIS I. GRAVES, | ) | |
| | ) | |
| Plaintiff, | ) | 4:08CV3000 |
| | ) | |
| v. | ) | |
| | ) | |
| SOCIAL SECURITY ADMINISTRATION, | ) | MEMORANDUM AND ORDER ON |
| Michael J. Astrue, Commissioner, | ) | REVIEW OF THE FINAL DECISION OF |
| | ) | THE COMMISSIONER OF THE SOCIAL |
| Defendant. | ) | SECURITY ADMINISTRATION |
| | ) | |

Now before me is Plaintiff Phyllis I. Graves's complaint, filing 1, which is brought pursuant to 42 U.S.C. § 405(g). The plaintiff seeks a review of a decision by the Commissioner of the Social Security Administration to deny the plaintiff's application for disability insurance benefits under Title II of the Social Security Act (the Act), see 42 U.S.C. §§ 401 et seq.[1] The defendant has filed an answer to the complaint and a transcript of the administrative record. (See filings 8-9.) In addition, the parties have filed briefs in support of their respective positions. (See Pl.'s Br., filing 13; Def.'s Br., filing 18.) I have carefully reviewed these materials, and I find that the Commissioner's decision must be affirmed.

---

[1] The complaint alleges that jurisdiction is also "predicated on" 42 U.S.C. § 1383(c)(3), and that the plaintiff sought Supplemental Security Income (SSI) benefits under Title XVI of the Act, 42 U.S.C. §§ 1381 et seq. (See Compl., filing 1, ¶¶ 1, 4.) The plaintiff's application for benefits does not cite Title XVI of the Act, however, (see Tr., filing 9, at 527), and the Administrative Law Judge's opinion states that the issue presented in the case "is whether the claimant is entitled to disability insurance benefits under Title II of the Social Security Act, as amended," (id. at 27). (See also Pl.'s Br., filing 13, at 1 ("Plaintiff filed an application for disability benefits under Title II.").) Because "[t]he same analysis determines disability under Title II and Title XVI," House v. Astrue, 500 F.3d 741, 742 n.2 (8th Cir. 2007), I shall not attempt to resolve this discrepancy. I will analyze this case as if it were brought solely under Title II.

1

# I. BACKGROUND

The plaintiff filed an application for disability insurance benefits on June 12, 2003. (See Transcript of Social Security Proceedings (hereinafter "Tr."), filing 9, at 527-29.) After the application was denied on initial review, (id. at 516-19), and on reconsideration, (id. at 522-25), the plaintiff requested a hearing before an Administrative Law Judge (ALJ), (id. at 526). This hearing was held on October 7, 2004, and April 19, 2005, (see id. at 840-94), and, in a decision dated August 12, 2005, the ALJ concluded that the plaintiff was not entitled to disability insurance benefits, (id. at 27-38). The ALJ made the following findings:

1. The claimant met the earnings requirements for disability insured status at the time shealleges that she became disabled, and continued to meet those requirements at all times relevant to this decision.

2. The claimant has not engaged in substantial gainful activity since April 4, 2003, the day after the unfavorable decision in a prior application for benefits.

3. The medical evidence establishes that the claimant . . . has the following impairments: chronic bilateral food pain due to chronic plantar fasciitis with heel spur deformities bilaterally; status post right total knee replacement; depressive disorder following bereavement with anxiety features; complaints of low back pain with sciatica; and low average to borderline intellectual functioning, which impairments are severe, but that she does not have an impairment or combination of impairments listed in or medically equal to one listed in Appendix 1, Subpart P, Regulations No. 4.

4. The allegations of the claimant are less than fully credible, and are accepted only insofar as those allegations are consistent with the determination of this decision that the claimant is not disabled.

5. A combination of impairments imposes the following limitations: can lift no more than 20 pounds occasionally and 10 pounds frequently; can sit up to 30 minutes at a time, and six hours out of an eight hour work day; can stand up to 30 minutes at a time, and no more than two hours out of an eight hour work day; cannot climb ladders; can no more than occasionally climb stairs, balance, stoop, kneel, crouch, or crawl; can not use foot controls; can do only simple, routine, repetitive work; and can have no more than occasional interaction with the public (20 CFR 404.1545).

6. The claimant is unable to perform her past relevant work as a cook helper, fast food cook, stock clerk, housekeeping cleaner, hand packager, nurse assistant, and school cafeteria cook.

7. The claimant is 40 years old which is defined as a younger individual (20 CFR 404.1563).

8. The claimant has completed 12 years of formal education (20 CFR 404.1564 and 416.964).

9. The claimant has no transferable skills, but is capable of the following unskilled occupations: Photo processing operator, Sorter/paster, and Addresser (20 CFR 404.1568).

10. When considering the claimant's age, education, work experience and residual functional capacity, jobs exist in significant numbers in the national economy that she can perform.

11. The claimant is not under a "disability," as defined in the Social Security Act, as amended (20 CFR 404.1520(g)).

(Tr. at 37.)

The plaintiff requested that the Appeals Council of the Social Security Administration review the ALJ's decision. (See Tr. at 16-17.) This request was denied, (see id. at 13-15), and therefore the ALJ's decision stands as the final decision of the Commissioner of Social Security.

On January 2, 2008, the plaintiff filed the instant action. (See Compl., filing 1.) Among other things, the plaintiff asks that the court "[r]eview and reverse the final decision of the Commissioner" and remand "the case for purposes of payment of benefits." (See id. at 2.)

## II. STANDARD OF REVIEW

I must review the Commissioner's decision to determine "whether there is substantial evidence based on the entire record to support the ALJ's factual findings." Johnson v. Chater, 108 F.3d 178, 179 (8th Cir. 1997) (quoting Clark v. Chater, 75 F.3d 414, 416 (8th Cir. 1996)). "Substantial evidence is less than a preponderance, but enough so that a reasonable mind might find it adequate to support the conclusion." Estes v. Barnhart, 275 F.3d 722, 724 (8th Cir. 2002) (quoting Johnson v. Apfel, 240 F.3d 1145, 1147 (8th Cir. 2001)); see also Richardson v. Perales,

402 U.S. 389, 401 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)).  The decision should not be reversed "merely because substantial evidence would have supported an opposite conclusion." Harris v. Shalala, 45 F.3d 1190, 1193 (8th Cir. 1995) (citation omitted).  However, the court's review is not simply "a rubber stamp for the [Commissioner's] decision and involves more than a search for evidence supporting the [Commissioner's] findings." Tome v. Schweiker, 724 F.2d 711, 713 (8th Cir. 1984).  See also Warburton v. Apfel, 188 F.3d 1047, 1050 (8th Cir. 1999) ("To determine whether existing evidence is substantial, 'we must consider evidence that detracts from the [Commissioner's] decision as well as evidence that supports it.'" (quoting Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993))).

   I must also determine whether the Commissioner applied the proper legal standards to arrive at his decision.  See Lowe v. Apfel, 226 F.3d 969, 971 (8th Cir. 2000); Johnson v. Chater, 108 F.3d 178, 179 (8th Cir. 1997); Nettles v. Schweiker, 714 F.2d 833, 835-36 (8th Cir. 1983).  No deference is owed to the Commissioner's legal conclusions.  See Brueggemann v. Barnhart, 348 F.3d 689, 692 (8th Cir. 2003).

   An ALJ is required to follow a five-step sequential analysis to determine whether an individual claimant is disabled.  See 20 C.F.R. § 404.1520(a).  The ALJ continues the analysis until the claimant is found to be "not disabled" at steps one, two, four or five, or is found to be "disabled" at step three or step five.  See 20 C.F.R. § 404.1520(a).  Step one requires the ALJ to determine whether the claimant is currently engaged in any substantial gainful activity.  See 20 C.F.R. § 404.1520(a)(4)(i), (b).  If the claimant is engaged in substantial gainful activity, the ALJ will find that the claimant is not disabled.  See 20 C.F.R. § 404.1520(a)(4)(i), (b).  Step two requires the ALJ to determine whether the claimant has an impairment or a combination of impairments that significantly limits his or her ability to do "basic work activities" and satisfies the "duration requirement." See 20 C.F.R. § 404.1520(a)(4)(ii), (c); id. § 404.1509 ("Unless your impairment is expected to result in death, it must have lasted or must be expected to last for a continuous period of at least 12 months.").  Basic work activities include, inter alia, "[p]hysical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling"; "[u]nderstanding, carrying out, and remembering simple instructions"; "[u]se of

judgment"; "[r]esponding appropriately to supervision, co-workers and usual work situations," and "[d]ealing with changes in a routine work setting."  20 C.F.R. § 404.1521(b).  If the claimant cannot prove such an impairment, the ALJ will find that the claimant is not disabled.  See 20 C.F.R. § 404.1520(a)(4)(ii), (c).  Step three requires the ALJ to compare the claimant's impairment or combination of impairments to a list of impairments.  See 20 C.F.R. § 404.1520(a)(4)(iii), (d).  If the claimant has an impairment "that meets or equals one of [the] listings," the analysis ends and the claimant is found to be "disabled."  See 20 C.F.R. § 404.1520(a)(4)(iii), (d).  If a claimant does not suffer from a listed impairment or its equivalent, then the analysis proceeds to steps four and five.  See 20 C.F.R. § 404.1520(a).  Step four requires the ALJ to consider the claimant's residual functional capacity$^2$ to determine whether the impairment or impairments prevent the claimant from engaging in "past relevant work."  See 20 C.F.R. § 404.1520(a)(4)(iv), (e), (f).  If the claimant is able to perform any past relevant work, the ALJ will find that the claimant is not disabled.  See 20 C.F.R. § 404.1520(a)(4)(iv), (f).  Otherwise, the analysis proceeds to step five.  At step five, the ALJ must consider the claimant's residual functional capacity, age, education, and past work experience to determine whether the claimant can do work other than that which he or she has done in the past.  See 20 C.F.R. § 404.1520(a)(4)(v).  If the ALJ determines that the claimant cannot do such work, the claimant will be found to be disabled at step five.  See 20 C.F.R. § 404.1520(a)(4)(v).  Conversely, if the ALJ concludes that the claimant can perform such work, the ALJ will find that the claimant is not disabled.

"In order to qualify for disability benefits, a claimant bears the burden of proving that he or she is unable to engage in any substantial gainful activity because of a medically determinable physical or mental impairment which is expected to last for at least twelve months or result in death."  Nettles v. Schweiker, 714 F.2d 833, 836 (8th Cir. 1983).  At step five of the sequential analysis described above, however, the burden shifts to the Commissioner to establish that the claimant has the residual functional capacity to do "some job that exists in the national

---

$^2$"'Residual functional capacity' is what the claimant is able to do despite limitations caused by all of the claimant's impairments."  Lowe v. Apfel, 226 F.3d 969, 972 (8th Cir. 2000) (citing 20 C.F.R. § 404.1545(a)).

economy." Id.  See also Clark v. Shalala, 28 F.3d 828, 830 (8th Cir. 1994).

In this case, the ALJ reached step five of the sequential analysis and concluded that the plaintiff was not disabled.  (See Tr. at 28 ¶¶ 5, 7.)

### III.   SUMMARY OF THE RECORD

The plaintiff alleges that she became disabled on April 4, 2003.  (See Tr. at 866.)  At that time, she was thirty-eight years old.  (Id. at 870.)  She has completed the twelfth grade in school, though some of her courses were special education classes.  (Id. at 551, 872-73.)  Her past relevant work has included employment as a cook helper, stock clerk, "housekeeping cleaner," hand packager, nurse assistant, and laundry worker.  (Id. at 35, 198, 611.)  The plaintiff's medical history will be summarized below, though it should be noted that the records predating the plaintiff's alleged onset date fall within the ambit of a prior application for benefits that was denied at the hearing level on April 3, 2003.  (See Tr. at 480-92.)

In February 2000, the plaintiff underwent surgery to correct "plantar fasciitis with associated heel deformity of the left foot" and "[m]edial calcaneal neuritis of the left foot."  (Tr. at 219.)  On March 6, 2000, the plaintiff's podiatrist noted that the plaintiff had made satisfactory progress even though she had been disregarding instructions to avoid putting weight on her foot.  (Id. at 226.)  On May 1, 2000, the plaintiff underwent a similar surgical procedure on her right foot.  (Id. at 233-38.)

On January 19, 2001, surgery was performed to remove a ganglion cyst from the plaintiff's left foot and to "revise" the calcaneal cuboid joint.  (Tr. at 246-47.)  Sinus tarsi stripping was also performed on the plaintiff's left foot.  (See id.)

In July 2001, the plaintiff told her physical therapist that she was experiencing pain in both feet and could only tolerate standing for four or five hours at a time.  (Tr. at 255.)  By early September, she complained to her podiatrist that she could only stand for two hours before the pain in her left foot became intolerable.  (Id. at 292.)  A "left-foot plantar fasciotomy with removal of bone fragments" was performed on September 14, 2001.  (Id. at 288.)  On September 21, 2001, the plaintiff appeared at an emergency room with complaints of pain.  (Tr. at 267.)  She was admitted overnight for pain relief, and she was referred for pain management after it was

discovered that she had obtained pain control prescriptions from a number of physicians and had filled them at two different pharmacies. (Id. at 267-68, 272, 289.) Records also indicate that the plaintiff underwent arthroscopic surgery on her right knee in September 2001. (Tr. at 403, 422.)

On October 10, 2001, the plaintiff reported that she had no more pain in her feet and that she could stand "a lot more." (Id. at 287.) The plaintiff was reminded, however, that it would be two months before she could return to full weight bearing on her left foot. (Id.) On October 12, 2001, the plaintiff was hospitalized for severe foot pain and complained of difficulty walking and sleeping. (Id. at 308.) Depression was also noted, (id.), and on October 17, 2001, the plaintiff was diagnosed with adjustment disorder with depressed mood and was prescribed medication, (id. at 318, 356).

The plaintiff was hospitalized from November 7, 2001, through November 13, 2001, after she suffered a severe headache following an epidural bilateral lumbar sympathetic block that had been performed to treat her foot pain. (Tr. at 324, 332.)

On November 16, 2001, Twila Preston Haigh, Ph.D., performed a consultive psychological examination of the plaintiff. (Tr. at 350-53.) The plaintiff was diagnosed with "Major Depressive Disorder, Single Episode, Severe, with Psychotic Symptoms," "Borderline Intellectual Functioning (Provisional) Rule Out Mild Mental Retardation," "Repeated knee and foot surgeries, pain," "Problems with primary support group, unemployed, financial problems," and a Global Assessment of Functioning (GAF) score of 50. (Id. at 352-53.)[3]

In March 2002, the plaintiff underwent a second arthroscopic surgery on her right knee. (Tr. at 631.) Thereafter, the plaintiff was diagnosed with congestive heart failure and was hospitalized from April 27, 2002, through May 1, 2002, for treatment. (Id. at 443.) The plaintiff's echocardiogram results were normal, however, and a chest x-ray revealed no evidence of heart failure. (Id. at 454.) The plaintiff's physician, Dr. Folchert, opined that the plaintiff's medication might be contributing to some of her symptoms, which included shortness of breath,

---

[3]"The Global Assessment of Functioning Scale is used to report 'the clinician's judgment of the individual's overall level of functioning.'" Juszczyk v. Astrue, 542 F.3d 626, 627 n.2 (8th Cir. 2008) (citations omitted). In a recent case, the Eighth Circuit noted that a GAF score of 65 represented mild impairment, a score of 57 represented moderate impairment, and a score of 50 represented serious impairment. Sloan v. Astrue, 499 F.3d 883, 885 (8th Cir. 2007).

fluid retention, and weakness. (Id.) She was hospitalized again in June 2002 due to respiratory difficulties, and it was determined that the plaintiff accidentally overdosed on methadone. (Id. at 463-69.)

Arthroscopic surgery was performed on the plaintiff's right knee for the third time in December 2002. (Tr. at 631-40.) Then in March 2003, the plaintiff underwent right knee replacement surgery. (Id. at 653-60.) On April 1, 2003, shortly before the alleged disability onset date, the plaintiff reported that her knee was sore, but that she was doing well. (Id. at 645.) On June 4, 2003, however, the plaintiff reported that her knee was causing her pain, that she was not sleeping well, and that methadone was not "working." (Id. at 675.) An x-ray examination performed on the following day revealed "excellent alignment," and the plaintiff's surgeon noted that he was "pleased with her response at this time." (Id. at 689.) A record dated July 16, 2003, indicates that the plaintiff sleeping medication was discontinued after she exceeded the recommended dosage. (Id. at 704.) After examining the plaintiff again on August 7, 2003, the surgeon found that the plaintiff was "doing extremely well," and the plaintiff reported that she was pleased with her surgery. (Id. at 688.)

On September 4, 2003, the plaintiff complained of difficulty sleeping, pain in both feet, and right knee pain to Dr. Bruce Keppen. (Tr. at 708.) She was also tearful about the death of her father, and Dr. Keppen advised the plaintiff to consult with Dr. Folchert about her depression. (Id.)

The plaintiff visited Dr. Keppen again on December 4, 2003, and repeated her complaint of foot pain. (Tr. at 710.) Dr. Keppen noted that the plaintiff's knee was doing well and that her depression was "under fair control." (Id.) He prescribed medication to help "improve" her pain and her sleep and to decrease her weight. (Id.)

On March 8, 2004, the plaintiff told Dr. Keppen that she continued to have pain in her left foot. (Tr. at 712.) In addition, she was "quite depressed" and had moved in with a family member following the recent death of her husband. (Id.) Dr. Keppen continued her medications "at current doses." (Id.)

On March 25, 2004, Dr. Folchert admitted the plaintiff to the hospital after she reported that she was feeling depressed and had suicidal thoughts. (Tr. at 733.) Dr. Rodney Dean, an on-

call psychiatrist at the hospital, evaluated the plaintiff. (Id. at 735-36.) Dr. Dean noted that the plaintiff commented that she "wanted to join her husband," though she denied having any active plan to commit suicide. (Id. at 736.) The plaintiff also reported having "some illusions at time feeling as if she can hear her deceased husband," although she denied having any hallucinations, delusions, paranoia, or other psychotic symptoms. (Id.) Dr. Dean's diagnosis included "major depressive disorder, recurrent without psychosis," and "pain disorder with both psychological and physiological features," and he found the plaintiff's current GAF score to be 30. (Id.) He admitted the plaintiff "for acute stabilization" and placed her on Zoloft and Seroquel. (Id.) The plaintiff was discharged from the hospital on or about April 2, 2004, in "good and stable" condition. (Id. at 732.)

The plaintiff was seen by Dr. William Fuller for a psychiatric evaluation on April 29, 2004. (Tr. at 744-45.) Dr. Fuller noted that the plaintiff was "a bit disheveled" and slow-moving during her appointment, and that she was "able to attend to the interview, but act[ed] as though her heart [was] not in it." (Id. at 744.) The plaintiff admitted to "mostly passive" suicidal ideation, but occasionally had compulsive thoughts about wanting to harm herself. (Id. at 745.) Dr. Fuller diagnosed "major depressive episode (recurrent), found the plaintiff's GAF score to be 35, added an additional medication to the plaintiff's regimen, and indicated that the plaintiff "should begin individual intensive psychotherapy." (Id.)

On July 1, 2004, the plaintiff complained to Dr. Keppen of left foot pain. (Tr. at 788.) Dr. Keppen noted that the plaintiff was "very pleasant and cooperative" and appeared "to have a pretty good affect." (Id.) He performed steroid injections and discharged the plaintiff. (Id. at 788-89.)

The plaintiff had a follow-up appointment with Dr. Fuller on July 7, 2004. (Tr. at 739-40.) The plaintiff reported that she was crying often and was feeling worse. (Id. at 739.) She was poorly groomed and moved slowly, and her mood and affect were depressed. (Id.) Dr. Fuller diagnosed the plaintiff with major depression (recurrent) and assessed her GAF score as 35. (Id.) He also altered her medications. (Id. at 740.)

On July 26, 2004, the plaintiff was hospitalized for treatment of depression after she told Dr. Folchert that she planned on committing suicide on the fifteenth day of "some month." (Tr.

9

at 795.) She explained that her husband had died on the fifteenth, and she wanted to be with him. (Id.) Records also indicated that the plaintiff had "been taking too many sleeping pills, not so much to kill herself, but just to sleep continuously." (Id. at 798.) During her hospitalization, however, she spoke about overdosing on some pills because she did not want to live. (Id.) The length of her hospitalization is not clear; however, records indicate that the plaintiff underwent electroconvulsive therapy on August 11, 2004, with an additional treatment scheduled for August 13, 2004. (Id. at 790.)

On September 12, 2004, the plaintiff was hospitalized for a third time "for major depression." (Tr. at 802.) Medical records indicate that the plaintiff was brought to the emergency room by local authorities, who had been contacted by the plaintiff's worried family members. (Id. at 805.) The plaintiff was found by the authorities "by one of the local waterways, just sitting and looking into the water." (Id.) She had superficial cuts on her wrists. (Id.) The plaintiff admitted that she had stopped taking her medications after Dr. Fuller adjusted them earlier in the month. (Id.) Records indicate that the plaintiff showed "slow improvement" during her hospitalization, and she was released home on September 15, 2004. (Id. at 802.)

Dr. Fuller saw the plaintiff for a follow-up on October 6, 2004. (Tr. at 831.) Dr. Fuller noted that the plaintiff was very poorly groomed, depressed, pessimistic, and "quite hopeless." (Id.) He made changes to her medication and planned to see her in one month for another follow-up. (Id. at 832.)

As noted above, on October 7, 2004, the plaintiff testified in a hearing before the ALJ. (Tr. at 864.) She stated that she was five feet, eight inches tall and weighed 242 pounds at the time of the hearing. (Id. at 870.) She added that she lost a significant amount of weight–33 pounds–between April 4, 2003, and the date of the hearing. (Id.) She attributed her decrease in weight to the loss of her husband and denied that it was "by design," though records indicate that the plaintiff had long been prescribed medication that was expected to decrease her weight. (Id. at 870-71; see also, e.g., id. at 710.) She testified that her foot pain prevents her from returning to her past jobs. (Id. at 877.) More specifically, she claimed that her doctors told her that the muscles in her feet were deteriorating and that "eventually" she will not be able to walk six or eight feet. (Id. at 877-78.) She added that her feet hurt even when she sits; that none of her

medications or other treatments helped her foot pain or her depression; that she can sit for only thirty minutes before she has to get up and move around due to her foot pain; that her daughter rubs her feet for her for three or four hours per day; that she performs no hobbies or other activities; and that she leaves her house approximately twice per week to visit family.  (Id. at 878, 881, 884-85, 890-91.)  She stated that she did not drive a car and had not possessed a car since her husband's death.  (Id. at 891.)  After the plaintiff's testimony was complete, the ALJ then began to question a Vocational Expert (VE); however, because the record lacked a "mental evaluation," the ALJ directed that such an evaluation be done, left the record open, and continued the hearing.  (Id. at 892-93.)

      On November 3, 2004, the plaintiff told Dr. Fuller that she was doing "somewhat better." (Tr. at 829.)  Dr. Fuller noted that the plaintiff was "well groomed, pleasant, and cooperative," and that her mood was "mildly depressed."  (Id.)  He also noted that she was pessimistic and "continue[d] with some suicidal ideation," though she was "not quite as hopeless as previously." (Id.)  He found her GAF to be 45, and he continued her on her medication regimen.  (Id. at 829-30.)

      On November 9, 2004, the plaintiff appeared before Dr. Dena Olwan for a consultive psychological evaluation.  (Tr. at 823.)  Dr. Olwan noted that the plaintiff was adequately groomed and alert, and the plaintiff reported that "currently she has no difficulty keeping up with personal hygiene."  (Id. at 823-24.)  Dr. Olwan found, however, that the plaintiff "did not know commonly known historical figures or historical facts" and had "poor abstraction abilities."  (Id. at 824.)  Also, Dr. Olwan concluded that the plaintiff "did not have a good understanding of common social practices and how to respond to common social situations."  (Id. at 824.)  Dr. Olwan found that although the plaintiff's "concentration and attention are limited, they are likely commensurate with her intellectual functioning, which is estimated to be in the low average to borderline range based on her history of special education classes."  (Id.)  The plaintiff reported that she was depressed "about 4 days out of an average week," that she cries because she wants to be with her husband, and that she "visits the cemetery about 3 days a week."  (Id.)  Her depression increases on the fifteenth of each month "due to the death of her husband on the 15th of Feb[ruary]."  (Id.)  Her sleep and appetite were poor, and she had "feelings of hopelessness on

11

a daily basis." (Id.) Although she had "no history of psychosis, including hallucinations, delusions, paranoid ideation, thought broadcasting or insertion or other abnormal perceptual experiences," the plaintiff did report "seeing her husband on the couch in her home since his death and hearing him talk to her." (Id.) Dr. Olwan indicated that "this is a common experience following a significant loss and appears to be a normal response to a loss and her way of coping with her own doubts and feelings of hopelessness." (Id.)

The plaintiff told Dr. Olwan that "[s]he gets up at 7 a.m. and takes her daughters to school at 7:30 a.m." (Tr. at 824.) Then "[s]he returns home, rests or sleeps for a couple more hours, then gets up and showers and walks around the house. She is able to do dishes, laundry, and take her medications without assistance," though her sister sometimes reminds her to take her medications. (Id.) "She picks up her kids from school at 3:15 p.m.," and after visiting with her mother, she prepares dinner with help from her children. (Id.) Dr. Olwan concluded,

> Based on [the plaintiff's] recent and current functioning, she is expected to be capable of understanding instructions and procedures [but] may have poor recall due to below normal intellectual functioning, poor short-term memory functioning, and depressive symptoms. She expected to have below average concentration and attention and is fairly inwardly focused and preoccupied with internal stimuli. She has limited ability to cope with loss and psychological stress. She is likely to be rather introverted in a work setting and may avoid interacting with others due to a recent tendency to withdraw from others. She has had impaired judgment off and on recent months with regard to recurrent suicidal thoughts and may have difficulty making decisions efficiently, responding effectively to change, and using appropriate judgment in the workplace. She is also on a number of medications that may impair her cognitive functioning and energy level in the workplace.

(Id. at 825.) Dr. Olwan found the plaintiff's current GAF to be 55. (Id.)

On January 18, 2005, the plaintiff reported to Dr. Folchert that her depression had been "much better" since her psychiatrist increased the dosages of some of her medications, and Dr. Folchert noted that the plaintiff was doing well. (Tr. at 837.)

The plaintiff saw Dr. Fuller for a follow-up on March 30, 2005. (Tr. at 827-28.) The plaintiff reported that she was "continuing to be irritable and the family [was] complaining a lot," but "her mood [was] better and she actually [felt] better most of the time." (Id. at 827.) She also reported that she was having "problems in her home partially because she has a new boyfriend

and the children are not accepting of that situation." (Id.)  Dr. Fuller noted that the plaintiff's mood was "euthymic to perhaps mildly hypomanic," and he diagnosed the plaintiff with "Bipolar Disorder Type II (currently hypomanic)." (Id. at 827-28.)  He assessed the plaintiff's GAF as 45. (Id. at 828.)  Adjustments were made to the plaintiff's medications.  (Id.)

On April 18, 2005, the plaintiff reported low back pain to Dr. Folchert.  (Tr. at 833.)  X-rays revealed no "acute pathology."  (Id.)  Dr. Folchert diagnosed "low back pain with left sciatica," and prescribed medication.  (Id.)

The hearing before the ALJ resumed on April 19, 2005.  (See Tr. at 840.)  The ALJ asked the VE to consider whether a person with the same age, education, and work experience as the plaintiff could perform work if her RFC included the following limitations: frequent lifting limited to 10 pounds; occasional lifting limited to 20 pounds; standing limited to 30 minutes at a time for two hours total in an eight-hour workday; sitting limited to 30 minutes at one time and for six hours total in an eight-hour workday; no ladder climbing, kneeling, or crawling; occasional stair climbing, balancing, stooping, and crouching; no foot pedal work; no exposure to "hazards"; occasional "home exposure to humidity[,] dust[,] and fumes"; and work limited to "simple routine constant [tasks] . . . and occasional interaction with the public." (Id. at 855-57.) The VE testified that such a person could perform unskilled sedentary work as, for example, a photo process worker; a sorter, cutter, or paster in the printing and publishing industry; or an addresser or filer in a clerical position.  (Id. at 856-57.)  The plaintiff's counsel then asked the VE to consider an individual who, in addition to limitations specified by the ALJ, had the limitations set forth in Dr. Olwan's report.[4]  (Id. at 859-60.)  The VE responded that the individual would not be able to perform "competitive employment," "if in fact the individual would not be able to get along with coworkers and/or supervisors or take criticism as is normally accepted in the workplace."  (Id. at 861.)  The VE also agreed that if each of the "impairments" or "problems" identified by Dr. Olwan occurred on an occasional basis, "the accumulation of the number of things" would "be a barrier or an impediment to sustaining" unskilled routine work.  (Id. at 861-862.)

---

[4] The relevant portion of Dr. Olwan's report has been quoted above.

## IV.   ANALYSIS

The plaintiff submits that the Commissioner's decision must be reversed for three reasons: 1) the ALJ erred by failing to incorporate Dr. Olwan's opinions into his RFC assessment; 2) the ALJ's hypothetical question to the VE was improper because it did not incorporate Dr. Olwan's opinions; and 3) the ALJ improperly discredited the plaintiff's testimony.  (Pl.'s Br., filing 13, at 17-23.)  I shall consider each of the plaintiff's points in turn.

### A.   Whether the ALJ Erred by Failing to Incorporate Dr. Olwan's Opinions Into His RFC Assessment

The plaintiff argues that the ALJ was required to "follow" the opinions of Dr. Olwan when determining the plaintiff's RFC.  (Pl.'s Br., filing 13, at 15.)  More specifically, she argues that the ALJ failed to comply with 20 C.F.R. § 404.1527(a)-(d) because: 1) "no medical findings, examinations or opinions in the file" contradict Dr. Olwan's opinions; 2) the ALJ did not use Dr. Olwan's opinions to formulate the RFC and did not explain why he failed to use them; and 3) the ALJ seems to have "simply substituted his medical opinion for that of the consultive examiner." (See Pl.'s Br., filing 13, at 15-16,18-19.)  I am not persuaded.

Section 404.1527(d) provides that the Commissioner is to "evaluate every medical opinion" that he receives.  In this case, the ALJ discussed Dr. Olwan's opinions at length, (see Tr. at 31), and stated specifically that Dr. Olwan's finding that the plaintiff's "intellectual functioning [was] in the low average to borderline range" was "consistent with the [RFC] posed to the [VE,] which included a limitation to simple, routine, repetitive work," (id. at 34-35).  In other words, the record clearly shows that the ALJ did consider Dr. Olwan's opinions when determining the plaintiff's RFC.  Even the plaintiff appears to concede that the ALJ did not completely disregard Dr. Olwan's opinions, though her argument is somewhat difficult to follow. (See Pl.'s Br., filing 13, at 18.)  I take it, however, that the plaintiff means to argue that the ALJ erred by failing to adopt Dr. Olwan's opinions in their entirety.  I shall proceed to analyze her arguments in that light.

First, the plaintiff suggests that the ALJ should have adopted Dr. Olwan's opinions because those opinions are uncontradicted by any other "medical findings, examinations, or

14

opinions in the file." (Pl.'s Br., filing 13, at 18.) It is true that Dr. Olwan's assessment of the plaintiff's limitations on November 9, 2004, is not contradicted. In fact, the ALJ agreed that the plaintiff "exhibited significant symptoms of depression" from February 15, 2004, when her husband died, until "mid January 2005," when the record established that the plaintiff "improved significantly." (Tr. at 35.) The ALJ explained, however, that the plaintiff's "significant symptoms of depression" did not satisfy the duration requirement for impairments. (Id.) More specifically, in assessing the plaintiff's limitations, the ALJ identified "depressive disorder following bereavement with anxiety features" as one of several severe impairments that satisfied the "duration requirement"; applied the Psychiatric Review Technique to determine the extent of the limitations imposed by the plaintiff's mental impairments;[5] summarized the record, including the findings of Dr. Olwan and the plaintiff's treating physicians; and explained that the "degree of limitation reflected in the Psychiatric Review Technique shows [the plaintiff's] functioning over the long term, rather than the period of less than 12 months during which she grieved her loss." (See Tr. at 28-32, 34-35.) In short, the plaintiff's claim that Dr. Olwan's opinions are uncontradicted by the record is accurate only if attention is focused on a band of time spanning less than 12 months. Beyond that band, Dr. Olwan's opinions are "contradicted" by the findings of the plaintiff's treating physicians, who concluded that the plaintiff's depression was "under fair control" in December 2003 and "much better" in January 2005. See, e.g., Brown v. Barnhart, 390 F.3d 535, 540 (8th Cir. 2004) ("If an impairment can be controlled by treatment or medication, it cannot be considered disabling.") (quoting Roth v. Shalala, 45 F.3d 279, 282 (8th Cir. 1995)). Because Dr. Olwan's opinions are contradicted by the record insofar as the plaintiff's "long term" limitations are concerned, I must reject the plaintiff's argument that the ALJ erred by failing to adopt those opinions in full.

      The plaintiff also claims that the ALJ erred by failing to explain why he "discredited" Dr.

---

[5]Applying the "Psychiatric Review Technique," the ALJ concluded, "As a result of the claimant's mental impairments . . . the claimant has a mild limitation in the activities of daily living, a mild to moderate limitation in maintaining social functioning, a mild limitation in concentration, persistence or pace for simple tasks, a moderate limitation in concentration, persistence or pace for complex tasks, and has at least once or twice had episodes of deterioration or decompensation." (Tr. at 28.)

Olwan's opinions. (Pl.'s Br., filing 13, at 15-16, 18-19.) Preliminarily, I note that Dr. Olwan was not a "treating source" whose opinion might have been entitled to "controlling weight." See 20 C.F.R. § 404.1527(d). On the contrary, the opinions of a consulting source who examines a claimant only once, such as Dr. Olwan, do not generally constitute substantial evidence. E.g., Lacroix v. Barnhart, 465 F.3d 881, 888 (8th Cir. 2006) (citing Kelley v. Callahan, 133 F.3d 583, 589 (8th Cir. 1998)); Metz v. Shalala, 49 F.3d 374, 378 (8th Cir. 1995). In any event, the ALJ did not discredit Dr. Olwan's opinions insofar as they pertained to the plaintiff's intellectual functioning; in fact, he stated specifically that his RFC was consistent with her opinions on this issue. (See Tr. at 34-35.) As far as the plaintiff's depression is concerned, and as noted above, the ALJ clearly explained why his assessment did not include the "significant symptoms of depression" that were observed during the plaintiff's bereavement. Although the ALJ did not state specifically that Dr. Olwan's opinions were being "discredited" for this reason, it is clear that Dr. Olwan's examination occurred during this bereavement period and that her opinions did not reflect the plaintiff's "functioning over the long term" as established by the medical record as a whole. (Tr. at 35.) The plaintiff has not persuaded me that the ALJ was required to make more specific findings on this point.

Finally, the plaintiff submits that the ALJ improperly substituted his opinions for those of Dr. Olwan. It is true that "[a]n 'ALJ must not substitute his opinions for those of [a] physician,'" Finch v. Astrue, 547 F.3d 933, 938 (8th Cir. 2008) (citation omitted), and an ALJ's RFC finding must be supported by some medical evidence, e.g., Guilliams v. Barnhart, 393 F.3d 798, 803 (8th Cir. 2005). Nevertheless, "[t]he ALJ may reject the opinion of any medical expert where it is inconsistent with the medical record as a whole." Finch, 547 F.3d at 938. As explained above, the ALJ carefully considered the medical records; recognized that for a certain period of time, the plaintiff was seriously limited–and indeed hospitalized repeatedly–due to her depression; and properly concluded that, based on the entire record, these serious limitations did not last "for a continuous period of at least 12 months." 20 C.F.R. § 404.1509. The ALJ's decision is supported by substantial evidence, and the ALJ did not merely substitute his opinions for those of Dr. Olwan.

In summary, the ALJ did not ignore Dr. Olwan's opinions in assessing the plaintiff's

16

limitations, his decision adequately explains why his assessment differs from that of Dr. Olwan, and he did not improperly substitute his opinions for Dr. Olwan's. The ALJ's RFC assessment is supported by substantial evidence, and I am not persuaded that reversal is warranted merely because this assessment did not incorporate all of Dr. Olwan's opinions.

### B. Whether the ALJ Erred by Failing to Incorporate All of Dr. Olwan's Opinions into the Hypothetical Question Posed to the VE

The plaintiff argues next that because the ALJ's hypothetical question to the VE did not include all of Dr. Olwan's opinions, the ALJ's finding of "no disability" is not supported by substantial evidence. (See Pl.'s Br., filing 13, at 19-20.) "The hypothetical question posed to the vocational expert must 'capture the concrete consequences of the claimant's deficiencies,'" but "the ALJ may exclude any alleged impairments that [he] has properly rejected as untrue or unsubstantiated." Johnson v. Apfel, 240 F.3d 1145, 1148 (8th Cir. 2001) (citations omitted). As explained above, the ALJ concluded that some of the limitations specified by Dr. Olwan did not satisfy the duration requirement for impairments, and his decision to exclude those limitations from his RFC assessment was supported by substantial evidence. The ALJ was not required to include the rejected opinions in his hypothetical question to the VE. E.g., Howe v. Astrue, 499 F.3d 835, 841-42 (8th Cir. 2007).

### C. Whether the ALJ Improperly Discredited the Plaintiff's Testimony

The plaintiff argues that the ALJ had no basis to discredit the plaintiff's testimony about "her subjective difficulties from her pain and difficulty standing and [her testimony] related to her psychological problems." (Pl.'s Br., filing 13, at 21.) I disagree.

The Eighth Circuit has outlined the factors that an ALJ must consider when evaluating a claimant's subjective complaints:

> In addition to objective medical evidence, an ALJ must examine "the claimant's prior work record, and observations by third parties and treating and examining physicians relating to . . . 1. the claimant's daily activities; 2. the duration, frequency and intensity of the pain; 3. precipitating and aggravating factors; 4.

17

> dosage, effectiveness and side effects of medication; [and] 5. functional restrictions."

Casey v. Astrue, 503 F.3d 687, 695 (8th Cir. 2007) (quoting Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984) (per curium order)). "While these considerations must be taken into account, the ALJ's decision need not include a discussion of how every Polaski factor relates to the claimant's credibility." Id. "If an ALJ explicitly discredits the claimant's testimony and gives good reason for doing so," the court "will normally defer to the ALJ's credibility determination." Id. at 696.

In evaluating the plaintiff's credibility in this case, the ALJ found first that "[t]he claimant's activities of daily living are not consistent with an allegation of disability as a whole." (Tr. at 33.) In support of this conclusion, the ALJ noted that the plaintiff "told the psychologist that she had no difficulty keeping up with personal hygiene, was able to keep up with bill paying without assistance, and would get up and take her children to and from school." (Id. at 33-34.) The plaintiff also stated that she washed dishes and laundry for her family, prepared dinner, helped her children with their homework, and, on "normal days," would go to the mall. (Id. at 34.) The ALJ's summary of the plaintiff's activities is supported by substantial evidence in the record, and his conclusion that these activities undermine the plaintiff's allegations of disability is not erroneous. See, e.g., Nguyen v. Chater, 75 F.3d 429, 430, 431 (8th Cir. 1996) (holding that visiting neighbors, cooking meals, doing laundry, and attending church are "incompatible with disabling pain"); Casey, 503 F.3d at 696 ("While Casey's ability to perform these activities does not disprove disability as a matter of law, '[i]nconsistencies between subjective complaints of pain and daily living patterns may . . . diminish credibility.'" (citation omitted)).

Next, the ALJ listed a number of inconsistencies between the plaintiff's testimony and the medical record. (See Tr. at 34.) For example, the ALJ noted that the plaintiff's claim that "her doctors had told her that in the next two years she may not be able to walk" was not supported by any of the treatment notes in the record. (Id.) Also, the ALJ recognized that although the plaintiff claimed that her weight dropped from 275 pounds to 242 pounds "due to her difficulties after losing her husband," records indicated that the plaintiff was concerned about her weight, sought a prescription for a diet pill, and was "started" on Phentermine. (Id.) The ALJ's

identification of these specific inconsistencies lends support to his credibility determination. See Howe v. Astrue, 499 F.3d 835, 841 (8th Cir. 2007) ("Because the ALJ described the inconsistencies on which he relied in discrediting Howe's complaints and because those inconsistencies were supported by the record, we affirm the ALJ's credibility finding.").

The ALJ then observed that there was "some evidence of . . . the claimant not taking her medication as prescribed." (Tr. at 34.) Specifically, the ALJ noted that after the plaintiff exceeded the prescribed dosage of her sleeping medication, her physician ordered that she "not receive any more prescriptions for sleeping pills." (Id.) The ALJ also correctly noted that the plaintiff stopped taking her medication shortly before one of her hospitalizations for depression. (Id.) Relatedly, the ALJ found that there was evidence in the record that the plaintiff "has been helped by her medications," at least when she took them as directed. (Id.) As discussed previously, evidence that an impairment can be controlled by medication or treatment indicates that the impairment is not disabling. See Brown v. Barnhart, 390 F.3d 535, 540 (8th Cir. 2004).

Finally, the ALJ found that the plaintiff's work history was "generally modest and uneven" and lacking "any record of substantial earnings." (Tr. at 35.) The ALJ concluded that this history "fails to show any strong financial motivation to work [that] would tend to support [her] allegations of disability." (Id.) See also, e.g., Pearsall v. Massanari, 274 F.3d 1211, 1218 (8th Cir. 2001) ("A lack of work history may indicate a lack of motivation to work rather than a lack of ability.").

In summary, the ALJ pointed to substantial evidence in the record supporting his finding that the plaintiff's subjective complaints were not fully credible. Under these circumstances, his credibility determination is entitled to deference. See Casey, 503 F.3d at 696.

**IT IS ORDERED** that the Commissioner of Social Security's decision is affirmed.

Dated January 26, 2009.

                      BY THE COURT

                      s/ Warren K. Urbom
                      United States Senior District Judge